Filed 7/8/13  P. v. Duarte CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ROBERTO DUARTE, JR.,<br><br>    Defendant and Appellant. | G041195<br><br>(Super. Ct. No. 07WF0962)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, James A. Stotler, Judge.  Affirmed in part and reversed in part.

Lynelle K. Hee, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons and Julie L. Garland, Assistant Attorneys General, Christine Levingston Bergman, William M. Wood, and Heather F. Crawford, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Roberto Duarte, Jr., of discharging a firearm with gross negligence (count 1-Pen. Code, § 246.3, subd. (a)),[1] being a felon in possession of a firearm (count 2-§ 12021, subd. (a)(1)), street terrorism (count 3-§ 186.22, subd. (a)), and misdemeanor brandishing a firearm (count 4-§ 417, subd. (a)(2)(A)).  Additionally, the jury found true he committed two of the felonies for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), and he had previously suffered a strike and a serious felony prior (§§ 667, subds. (a), (d) & (e)(1), 1170.12, subds. (b) & (c)(1)).  The trial court denied Duarte's new trial motion and sentenced him to a total term of 15 years, four months in state prison.

On appeal, Duarte argued the trial court erred in refusing to allow him to introduce evidence the gang expert who testified at trial had destroyed traffic tickets in order to prevent prosecution.  He also claimed the court erred by failing to stay the sentence on his street terrorism conviction (count 3), and the court should not have imposed punishment for the street terrorism conviction and the street terrorism enhancement.  After oral argument, we requested the parties submit supplemental briefing on the effect of *People v. Sanchez* (2009) 179 Cal.App.4th 1297 [interplay between § 186.22, subd. (a) & § 654], in this case.

On June 2, 2010, we filed our decision.  We subsequently granted rehearing on our own motion.  The following month, the Fourth Appellate District, Division One, filed its decision in *People v. Mesa* (2010) 186 Cal.App.4th 773 (*Mesa*).

In September 2010, Duarte requested permission to file a supplemental letter brief on the effect of the then recently decided Third Appellate District's opinion in *People v. Rodriguez* (2010) 188 Cal.App.4th 722, concerning the issue of whether a defendant gang member who acts alone can be convicted of the substantive offense of

---

[1]     All further statutory references are to the Penal Code, unless otherwise indicated.

street terrorism. The following month, we denied his request. The California Supreme Court granted review in *Mesa, supra,* 186 Cal.App.4th 773, review granted October 27, 2010, S185688.

On November 16, 2010, we filed our decision in *People v. Duarte* (2010) 190 Cal.App.4th 82 (*Duarte*). In that case, we concluded the trial court should have stayed the sentence on his street terrorism conviction, count 3, pursuant to section 654. We rejected Duarte's other claim, the evidentiary issue, and affirmed the judgment as modified. We denied Duarte's petition for rehearing the following month.

The California Supreme Court granted review in *People v. Rodriguez, supra,* 188 Cal.App.4th 722, review granted January 12, 2011, S187680. The California Supreme Court also granted review in *Duarte, supra,* 190 Cal.App.4th 82, review granted February 24, 2011, S189174, and deferred action pending the outcome in *Mesa, supra,* 186 Cal.App.4th 773, S185688.

In July 2012, the California Supreme Court dismissed review in *Duarte, supra,* 190 Cal.App.4th 82, S189174, in light of its decision in *People v. Mesa* (2012) 54 Cal.4th 191. The remittitur issued in *Duarte, supra,* 190 Cal.App.4th 82, on July 25, 2012. Five months later, the California Supreme Court filed its decision in *People v. Rodriguez* (2012) 55 Cal.4th 1125 (*Rodriguez*).

On May 13, 2013, Duarte filed a motion to recall the remittitur, reinstate the appeal, and reverse his conviction for street terrorism. In the motion, Duarte argues that based on *Rodriguez, supra,* 55 Cal.4th 1125, he cannot be convicted of violating section 186.22, subdivision (a), the substantive offense of street terrorism, because he acted alone. We ordered the Attorney General to respond. In its response, the Attorney General concedes this court should recall the remittitur and reverse Duarte's conviction based on the court's holding in *Rodriguez, supra,* 55 Cal.4th 1125.

3

In the aftermath of *Rodriguez, supra,* 55 Cal.4th 1125, Duarte stands convicted under an invalid theory of street terrorism, a point the Attorney General agrees with. Thus, we recall the remittitur, vacate our prior opinion, reinstate the appeal, issue this new opinion, and order that a new remittitur issue. We reverse Duarte's conviction for street terrorism.[2] We again reject Duarte's remaining claim the trial court erred in excluding evidence and affirm the judgment in all other respects.[3] (Cal. Rules of Court, rule 8.272(c)(2); *People v. Mutch* (1971) 4 Cal.3d 389 [recall of remittitur adjunct to writ of habeas corpus and proper to implement defendant's right to habeas corpus where defendant convicted under statute that did not prohibit his conduct at the time]; *People v. Lewis* (2006) 139 Cal.App.4th 874, 879 [recalled remittitur and vacated opinion where basis for affirming conviction was later abrogated by California Supreme Court].)

FACTS

Brothers Victor Velasquez and Martin Velasquez[4] lived on Amberleaf Circle in Huntington Beach. Victor and Martin were both members of "Amberleaf" (AML) gang. The members of AML considered the group to be a gang, but law enforcement did not consider the group to be a criminal street gang because it did not meet the statutory definition. AML's rival was "South Side Huntington Beach" (SSHB), a criminal street gang.

---

[2]     We acknowledge Duarte did not raise this issue on appeal. However, after we granted rehearing, we denied his request to file a supplemental letter brief addressing the effect *People v. Rodriguez, supra,* 188 Cal.App.4th 722, on his appeal.

[3]     We have reconsidered our prior holding only to the extent necessary to rule on the merits of Duarte's claim based on *Rodriguez, supra,* 55 Cal.4th 1125.

[4]     For purposes of clarity, we refer to the brothers by their first names.

4

One early afternoon, after Victor returned home from school, both brothers went to a park at the end of Amberleaf Circle. While at the park, the brothers observed a dark-colored car speed up the street and stop in front of the park. The driver got out of the car and someone yelled, "He's got a gun." The brothers ran and hid in some nearby bushes. From the bushes the brothers heard three gun shots and the shooter yell, "South Side" or "South Side Huntington Beach." The man drove away in the car.

Neither Victor nor Martin immediately reported the incident to the police. It was not until two weeks later, after being arrested for a probation violation, that Martin provided law enforcement with information regarding the shooting. Martin was unable to pick Duarte's picture from a photographic lineup. Victor also provided information regarding the incident at a later date when he got into some trouble with the police over graffiti.

Shortly after the incident, police officers responded to Amberleaf Circle to investigate the shooting. Officers were looking for a midnight blue four-door car with a license plate that partially read: "5DYZ[]18." Although witnesses were fearful and not initially forthcoming, some told officers "Big Time," later identified as Duarte's gang moniker, was on the street with a gun. A witness by the name of Angelita Ramirez declined to speak with officers at the scene, but she agreed to call Officer Juan Munoz later. Later that evening, Ramirez called and spoke with Munoz. Ramirez related she had seen her cousin, Mario Lemus, run in front of her apartment, and she walked out to see why he was running. As she walked out she saw a person who she recognized as "Roberto" pointing a black-colored handgun in her direction. During a later interview, Ramirez was able to identify the gun as a revolver handgun. Ramirez said that when she realized "Roberto" was pointing the gun at her, she walked back into the house and locked the door. "Roberto" was further identified with the last name Duarte, and a physical description. Ramirez indicated Duarte was a male Hispanic, five feet eight to five feet 11 inches tall, about 23 years of age with a shaved head and a tattoo of writing

5

on his neck. Ramirez stated she had known Duarte for approximately five to seven years and had last seen him about a year or a year and a half ago. She would see him often when he came to her apartment complex to visit someone in an upstairs apartment. When Munoz showed Ramirez a photographic lineup including Duarte's picture, she was unable to identify anyone.

Two days after the shooting, Munoz observed Duarte seated in a vehicle that was parked next to a midnight blue four-door car with a license plate of "5DYZ718." Duarte's head was shaved, and he had "S.S.H.B." tattooed on the side of his head. When Munoz contacted Duarte, Munoz asked him if he had been at the Amberleaf location at the time of the shooting, and if the midnight blue car belonged to him. Initially, Duarte denied being present at the Amberleaf location on the day of the shooting, but admitted the car belonged to him. Later, Duarte disclosed he had been there looking for a group of AML members who had been bothering his younger brother. Duarte explained he had driven the midnight blue four-door Impala to Amberleaf but denied being involved in the shooting. Duarte advised Munoz that at the time the shooting took place he was filling out some job applications.

Ramirez testified at trial but said the only reason she was testifying was because she had been subpoenaed. She recounted that she and others in the neighborhood would not speak with Munoz because people in her neighborhood do not like to talk to police. She testified she was afraid to talk to Munoz and take his business card. Ramirez testified she had seen a bald man in a white T-shirt with writing on his neck holding a black object in his hand. She claimed she could not tell what the black object was, and denied telling Munoz it was a gun. As to the specifics of the description she gave Munoz, Ramirez at times claimed to not remember. Alternatively, she altered the description she provided Munoz rendering it less detailed. Ramirez said she did not recall if she had told Munoz the man she had seen was Duarte, whom she had known for six or seven years. Contrary to what she told Munoz about seeing Duarte on numerous

occasions prior to the incident, Ramirez claimed to have only seen Duarte one time. Ramirez also claimed to recall identifying someone in the lineup, who was not Duarte, as looking familiar to her.

Munoz testified he knew Duarte from previous contacts but had never arrested him. He described Duarte as having been heavier in the past but that the shaved head and tattoo on the side of his head were consistent with Munoz's past observations of Duarte. Munoz was aware of only two other SSHB members with similar tattoos and both were in custody at the time of the incident. Munoz also testified as to statements Ramirez made to him the night of the incident that were inconsistent with her testimony at trial.

Huntington Beach Detective Arthur Preece testified as a gang expert. He testified that gang tattoos demonstrate a member's pride in the gang and a member's permanent allegiance to the gang. He opined committing crimes, especially with a gun, garners respect for the offender or his gang and serves to intimidate potential witnesses from cooperating with law enforcement. Throughout his 22-year career with the Huntington Beach Police Department, Preece had interacted with members of the SSHB gang. He testified the gang had been in existence for more than 30 years and was an ongoing organization with about 70 members. He described SSHB's primary activities, pattern of criminal activity, and common names and symbols. He further testified as to the commission of two predicate crimes by the gang to establish SSHB was a criminal street gang as defined in section 186.22, subdivision (f).

With respect to Duarte's involvement in the gang, Preece described Duarte's continued association with known SSHB members dating back to 2001, and opined Duarte was an active member of SSHB on the date of the incident. Preece testified Duarte's moniker was "Big Time," and he had a number of SSHB gang-related tattoos, including "S.S.H.B." on the side of his head. Based on a hypothetical mirroring the facts of the incident, Preece opined the crime was committed for the benefit of SSHB.

7

Prior to Preece testifying, Duarte sought permission to impeach Preece with information he had destroyed traffic tickets to prevent prosecution. Duarte's defense counsel advised the court he had received information from the prosecutor in an unrelated case that on approximately four or five occasions over a seven-to-eight-year period, Preece kept routine traffic tickets from being put into the system. Counsel cited an affidavit Preece had prepared for an unrelated case. In it, Preece declared there were no copies of the tickets he had destroyed, or any reports relating to the destruction of the tickets. Preece also stated he had no recollection of conversations with other officers regarding his actions with regard to the tickets. Duarte asserted he did not know exactly what keeping routine traffic tickets from being put into the system entailed. He questioned whether this meant Preece directed another officer to pull a ticket before it was filed. Or did Preece go to the file room, or wherever citations are filed at Huntington Beach Police Department, and pull the citation himself? He then hypothesized as to what Preece may have informed other Huntington Beach police officers. He stated this information "opens a Pandora plethora of questions."

Duarte's defense counsel argued preventing the citations from getting into the system was a "criminal violation." He advised the court he intended to "take this information . . . to the United States Attorney's Office, at a minimum[, and] refer it to the Huntington Beach Internal Affairs Department[,] [b]ecause[] there [were] questions . . . of concealment of evidence, destruction of evidence, conspiracy, obstruction of justice, and probably . . . a number of other federal statutes [the conduct] could potentially . . . implicate." Duarte's counsel then advised the court it was "incumbent that the court should appoint counsel and have [Preece] properly advised."

The prosecutor did not dispute Preece had destroyed tickets. But the prosecutor explained members of a family in a neighborhood where Preece worked were witnesses to a gang-related crime. The father in that family had received citations for driving on a suspended license while driving his disabled daughter to the doctor. Preece

8

told her he destroyed the tickets to help a family involved in the unrelated case. The prosecutor insisted Preece did not lie at any time about what he had done when asked about the tickets. If anything, the detective may have failed to follow the procedures set out by his department for how to handle this type of situation. The prosecutor argued if evidence regarding a possible violation of a department policy or procedure were admitted, it would consume a huge amount of time.

Duarte's counsel insisted this information was proper impeachment because the conduct was relevant on issues of character and honesty. The prosecutor indicated that although counsel repeatedly asserted Preece's conduct amounted to a violation of law, she was unclear on what law it was that Preece allegedly violated. The prosecutor again argued this conduct amounted to a failure to follow department procedure and was not relevant to prove a witness's character for truthfulness. There was no evidence Preece ever lied about what he had done in connection with the tickets, in fact he was quite candid in his statements. The prosecutor objected to evidence regarding the tickets being admitted for the purpose of impeachment.

The trial court found Duarte's offer of proof vague and based, in significant part, on speculation. The court stated the information appeared to be irrelevant, and to the extent it might be relevant, it found the evidence to be remote and minimal at best. There was a danger the evidence would confuse and mislead the jury. Admission of the evidence would constitute an undue consumption of time on a collateral issue. The court noted the evidence was based on some sort of misconduct and not a conviction. Lastly, the court found the probative value of the evidence was outweighed by its prejudicial value. After making these findings, the court excluded the evidence under Evidence Code section 352.

Duarte called two alibi witnesses, Tiffany Pinero and Barbara Koch. Pinero, Duarte's girlfriend, was working at Quality Drug Long-Term Care in Newport Beach March 2, 2007, the day of the incident. Pinero recalled having lunch with Duarte at her workplace on March 2 and Duarte leaving her workplace at approximately 1:45 p.m. to go to a job interview. Koch, the owner of A-Ok Rentals, confirmed she interviewed Duarte for a job on March 2. Although she could not recall the exact time of the interview, she believed it took place between 12:00 p.m. and 4:00 p.m.

Duarte also called an investigator with the Orange County Alternate Public Defender's Office, Rolando Chavez, regarding an interview he had with Ernest Williams, Duarte's parole agent. Williams told Chavez that he had spoken with Munoz the afternoon of the incident and Munoz told him that Duarte had been seen with a gun at a gang member's funeral, but the Amberleaf incident was not discussed.

The prosecutor called Munoz to rebut issues raised by the defense evidence. Munoz testified he had given information to Williams about the gang member's funeral, but it was a separate incident not related to the Amberleaf incident. He believed Williams had confused the two incidents. Munoz testified when he arrested Duarte, Duarte never said he was with Pinero on March 2. Munoz also testified when he asked Duarte if he went anyplace other than A-Ok Rentals the afternoon of March 2, Duarte said he had but would not disclose where he had gone. The prosecutor also called a police officer witness who testified as to the driving times and distances. The officer calculated the driving time and distance between Pinero's workplace and Amberleaf to be about 11 to 12 minutes and about eight miles. The officer calculated the driving time between A-Ok Rentals and Amberleaf at 3:45 p.m. to be about five minutes but believed traffic was usually heavier at 3:45 p.m. than it would be at 1:45 p.m.

Prior to trial, the trial court granted Duarte's motion to bifurcate the trial on the strike and serious felony prior allegations. The jury convicted Duarte on all counts and found all allegations to be true. Duarte waived his right to jury trial on the strike and

10

serious felony allegations.  The court found both the strike and the prior allegations to be true.

The trial court sentenced Duarte to prison for 15 years and four months as follows:  count 1-four years and a consecutive five-year term on the gang enhancement; count 3-16 months; and the serious felony allegation-five years.  The court imposed and stayed (§ 654) the following sentences:  count 2-four years; and count 4-365 days in jail.

DISCUSSION

I. *Exclusion of Evidence*

Duarte claims the trial court prejudicially erred by refusing to allow him to introduce evidence Preece destroyed traffic tickets.  Duarte claims the exclusion of this evidence violated his federal and state constitutional rights to present a defense, to confront and cross-examine witnesses, and to due process and a fair trial.  Accordingly, Duarte asserts the more restrictive *Chapman*[5] standard of review applies.  The Attorney General argues any error in excluding the evidence was harmless but does not address the applicable standard of review.  Because we conclude there was no error, we need not weigh in on the applicable standard of review.

Evidence of past misdemeanor conduct involving moral turpitude may be introduced to impeach a witness's character because it is reasonable to infer a person who has committed a crime involving moral turpitude is more likely to be dishonest.  (*People v. Wheeler* (1992) 4 Cal.4th 284, 295 (*Wheeler*).)  In *Wheeler,* our Supreme Court cautioned that the admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude.  In order to be admissible for impeachment, past misconduct must be relevant to moral turpitude and have some logical

---

[5] The error must be found harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18.

11

bearing upon the veracity of a witness. (*Id.* at pp. 295-296.) Accordingly, we must first resolve whether the alleged misconduct, the destruction of traffic tickets, was a crime involving moral turpitude and relevant to the jury's determination of Preece's veracity.

We agree with the trial court that although Duarte ran through a laundry list of conceivable crimes, he was unable to articulate in any detail what specific crime Preece had committed. The record demonstrates Preece, an experienced police officer, admitted that on approximately four or five occasions over a seven-to-eight-year period he prevented the prosecution of routine traffic tickets. Duarte essentially argued based on this admission he believed it was probable that if he was allowed to delve into the circumstances surrounding the destruction of the tickets, criminal conduct would be revealed.

The prosecutor disputed Preece's actions amounted to criminal conduct. She argued that at most, Preece's admission might show he did not follow department policy in the way he handled the situation. Misdemeanor misconduct involving moral turpitude is admissible to impeach a witness because it "suggest[s] a willingness to lie." (*Wheeler, supra,* 4 Cal.4th at p. 295.) Here, the trial court found Duarte's offer of proof as to the import of Preece's conduct was vague and based in significant part on speculation. We agree. Whether Preece's actions amounted to conduct suggesting a willingness to lie under oath is unclear without further facts. The trial court properly excluded the evidence.

After finding the information not to be proper impeachment, the trial court reasoned that even if the information was admissible, the probative value of the evidence was outweighed by its prejudicial value. The court stated the evidence would consume an undue amount of time and had the potential of confusing the jury.

A trial court enjoys broad discretion under Evidence Code section 352 in determining whether the probative value of particular evidence is outweighed by concerns of undue prejudice and confusion or consumption of time. The exercise of this

12

discretion will not be disturbed on appeal except on a showing the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Frazier* (2001) 89 Cal.App.4th 30, 42.)

We find no abuse of discretion in the trial court's determination the probative value of this evidence would have been outweighed by its prejudicial value. Again, we agree with the trial court that internal police policies and procedures are not matters of common knowledge so the jury would need to be educated on these topics. This would consume a considerable amount of time on a collateral issue. Also, without a sophisticated understanding of the permissible actions law enforcement may take to prevent the prosecution of traffic tickets, it is probable the jury would be more confused than enlightened by Preece's actions. We conclude the court properly excluded this evidence under Evidence Code section 352.

## II. Street Terrorism-Substantive Offense

Relying on *Rodriguez, supra,* 55 Cal.4th 1125, Duarte contends he could not be convicted of violating section 186.22, subdivision (a), because he acted alone. The Attorney General agrees and so do we.

The street terrorism substantive offense, section 186.22, subdivision (a), states: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished . . . in the state prison for 16 months, or two or three years." The offense has three elements: (1) active participation in a criminal street gang; (2) knowledge the gang's members have engaged in a pattern of criminal gang activity; and (3) willfully promoting, furthering, or assisting in any felonious criminal conduct by members of the gang. (*People v. Albillar* (2010) 51 Cal.4th 47, 56.)

13

In *Rodriguez, supra,* 55 Cal.4th at page 1129, the issue was whether the third element of the crime described in section 186.22, subdivision (a)—willfully promoting, furthering, or assisting in any felonious criminal conduct by members of the defendant's gang—can be satisfied by felonious criminal conduct committed by the defendant acting alone. (*Rodriguez, supra,* 55 Cal.4th at p. 1129.) The *Rodriguez* court reasoned "[t]he plain meaning of section 186.22[, subdivision] (a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member. [Citation.]" (*Rodriguez, supra,* 55 Cal.4th at p. 1132.) Because defendant acted alone in *Rodriguez,* the court held he did not violate section 186.22, subdivision (a). (*Rodriguez, supra,* 55 Cal.4th at p. 1139.)

As the Attorney General concedes, *Rodriguez* controls the outcome of the issue here. Because Duarte acted alone in committing his crimes—the only crimes the prosecution relied on to support the third element of the gang participation count—there is insufficient evidence to support the conviction on that count. Accordingly, we reverse Duarte's conviction on count 3.

*III. Section 654*

Duarte contends the trial court erred by failing to stay the sentence on count 3, street terrorism, pursuant to section 654 because he had the same intent and objective in count 1, discharging a firearm with gross negligence. He also argues section 654 bars punishment for both the substantive street terrorism offense and the street terrorism enhancement. Because we now conclude Duarte cannot stand convicted of violating section 186.22, subdivision (a), we need not address his claims regarding section 654.

DISPOSITION

Duarte's motion to recall the remittitur is granted. We recall the remittitur, vacate our prior opinion, reinstate the appeal, issue this new opinion, and order that a new remittitur issue. We reverse Duarte's conviction for street terrorism (count 3), and strike the 16-month term on that count. We affirm the judgment in all other respects. The clerk

14

of the superior court is directed to prepare an amended abstract of judgment consistent with this opinion and forward it to the Department of Corrections and Rehabilitation, Division of Adult Operations.


O'LEARY, P. J.

WE CONCUR:


RYLAARSDAM, J.


ARONSON, J.